**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENDALL MCKENZIE and YI-CHIEH CHENG,<br><br>                    Plaintiffs,<br><br>    v.<br><br>THE ARENA GROUP HOLDINGS, INC.,<br><br>                    Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>**1. Violation of California Invasion of Privacy Act (CAL. PENAL CODE §638.51)**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Kendall McKenzie and Yi-Chieh Cheng ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, there are over 100 members in the proposed Class, and at least one member of the proposed Class is a citizen of a different state than Defendant. This Court has personal jurisdiction over Defendant because it conducts substantial business in California and it purposefully directed activities to California by intentionally tracking individuals in California through its websites: www.TheStreet.com, www.Parade.com, and www.AthlonSports.com.

## NATURE OF THE CASE

1.     This is a class action against Defendant The Arena Group Holdings, Inc. ("Arena" or "Defendant") for violating California laws intended to protect individuals' privacy rights.

2.     Unbeknownst to its users, Arena has partnered with various third parties, including Microsoft, to install sophisticated third-party tracking software on the landing page of its websites, www.thestreet.com ("The Street Website"); www.parade.com (the "Parade Website"); and www.athlonsports.com (the "Athlon

Website") (collectively, the "Arena Websites" or "Websites") for analytic, marketing, advertising, and commercial purposes. Through the use of pixels, cookies, code snippets, and other technologies, these third-party trackers – the Adnxs Tracker, Casale Media Tracker, PubMatic Tracker, TripleLift Tracker, Bounce Exchange Tracker, and 33Across Tracker    (collectively, the "Trackers") surreptitiously capture, analyze, and store detailed information about Arena Websites' visitors – including their Internet Protocol ("IP") addresses, browser and device information, unique digital identifiers, session data, clickstream activity, geolocation information, browsing history, and other personal information – without their consent or a court order. The Trackers also store cookies on users' browsers and send unique identifiers to the third parties that allow them to persistently track users not only on the Arena Websites, but across the internet and across multiple browsing sessions and devices.

3.    What is more, these third-party Trackers then share the personal data they have collected about Arena Websites' users with numerous third parties, including registered data brokers such as Index Exchange, Inc. ("Index Exchange"), PubMatic, Inc. ("PubMatic"), Stack Adapt, Inc. ("StackAdapt"), and Wunderkind Corp. f/k/a BounceX ("Wunderkind"). These third parties aggregate users' personal data, combine it with data they have obtained from other sources, and build comprehensive user profiles, which are sold to advertisers for targeted marketing

and advertising purposes. This relentless and seemingly inescapable targeted advertising unnerves users, leaving them feeling surveilled and their privacy violated as they carry out the everyday task of navigating the Internet. This invasion of privacy both unjustly enriches Defendants, who earn increased advertising revenue as a result of this tracking, and harms Plaintiffs and the Class, as their privacy rights are violated and their valuable personal information is being collected and shared without their consent.

4.    Because the third-party Trackers capture Websites visitors' "routing, addressing, or signaling information" without their consent or a court order, they constitute illegal "pen registers" under California's Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE § 638.51.

5.    Plaintiffs bring this action on behalf of all California residents who accessed one of the Arena Websites and had their IP addresses and other personal information collected by one or more third-party Trackers, including but not limited to the Adnxs Tracker, Casale Media Tracker, PubMatic Tracker, TripleLift Tracker, Bounce Exchange Tracker, and/or 33Across Tracker, during the relevant time period, to recover statutory and compensatory damages and to prevent Defendant from further violating the privacy rights of California residents.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and at least one member of the Class is a citizen of a different state than Defendant.

7.      This Court has personal jurisdiction over Defendant. First, Defendant has purposefully directed its activities to California by intentionally tracking individuals in California through the Arena Websites, which appeal to, and obtain substantial profits from, an audience in California. On information and belief, several million unique individuals visit the Arena Websites from California each month. Second, IP addresses are included in a user's HTTP request whenever a user visits any of the Arena Websites, and because an IP address can reveal geographic information and can be used to determine a user's city, state, and zip code, Defendant knows that Plaintiffs and other members of the Class are located in California when they access the Websites. Third, Defendant is also collecting Website visitors' IP addresses via the Trackers and targeting Californians with advertisements based in part on their California location. Fourth, Defendant sells subscriptions to Arena Website visitors and, on information and belief, Defendant sells such subscriptions to Arena Website visitors that reside in California. Fifth, one of the third-party Trackers Defendant has installed on its Websites (PubMatic) is owned and operated by a California-based company that is a California-registered data broker, and

another (Bounce Exchange Tracker) is also owned and operated by a California-registered data broker (Wunderkind Corp. f/k/a BounceX ("Wunderkind)). And finally, Defendant recognizes its California customer base in its Privacy Policy for the Arena Websites, which contains sections dedicated to California residents' privacy rights.[1]

8.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (2) Defendant is subject to personal jurisdiction in this District.

## **THE PARTIES**

9.      Plaintiff Kendall McKenzie is, and has been at all relevant times, a resident and citizen of California, residing in the city of Irvine, within the Central District of California. Ms. McKenzie has visited the Parade Website to read articles numerous times, including on or about October 29, 2025. Ms. McKenzie was in California when she visited the Parade Website.

10.     Plaintiff Yi-Chieh Cheng is, and has been at all relevant times, a resident and citizen of California, residing in the city of Covina, within the Central District of California. Mr. Cheng has visited The Street Website numerous times on

---

[1]     *Privacy Policy*, THE ARENA GRP. (Oct. 31, 2022), https://thearenagroup.net/privacy-policy/ (last visited Dec. 17, 2025).

his computer to read news articles, including on or about September 1, 2025. Mr. Cheng was in California when he visited The Street Website.

11.    Defendant The Arena Group Holdings, Inc. ("Arena") is, and has been at all relevant times, a Delaware corporation with its principal place of business located in New York, New York. Arena is a media and technology company managing multiple news brands, including multiple websites, that provide content to consumers across the United States, including California. Arena touts its substantial website traffic statistics, stating that The Street Website has 27 million average monthly users with 1.3 million social followers, the Parade Website has 48 million average monthly users with 65 million average monthly page views, and the Athlon Website has 46 million average monthly users with 72 million average monthly page views.[2] On information and belief, several million unique individuals visit the Arena Websites from California each month.

## FACTUAL ALLEGATIONS

### I.    CIPA

12.    The California Legislature enacted CIPA to protect certain privacy rights of Californians, expressly recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be

---

[2] THE ARENA GRP., https://thearenagroup.net/ (last visited Dec. 17, 2025).

tolerated in a free and civilized society." CAL. PENAL CODE § 630.

13.    To that end, CIPA prohibits, *inter alia*, "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." *Id.* § 638.51. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by a facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b).

14.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for its violation in the amount of $5,000 per violation. *Id.* § 637.2(a)(1).

## II.    **IP Addresses**

15.    An IP address is a globally unique numerical identifier assigned by an Internet Service Provider to networking devices such as modems or routers, that guides or routes communications across the internet. IP addresses are often written as four sets of numbers separated by periods (*e.g.*, 192.555.455.145), with the first two sets of numbers indicating the network the device is connected to, and the second set of numbers identifying the specific device being used. IP addresses function as the essential addressing system of the internet. and are necessary for routing internet communications to the correct location.

16.    An IP address can reveal geographical location information and can be

used to determine the city, state, and zip code where the user is located at a particular point. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. By using IP addresses to target specific households, businesses or events based on their location (sometimes referred to as "geomarketing"), advertisers can avoid spending money on ads unlikely to be seen by their target audience.

17.    Moreover, IP addresses allow businesses to track user interactions and behaviors across multiple websites, building detailed profiles of users' browsing habits and preferences tied to their location. They are particularly powerful for identifying and tracking specific individuals. When individuals use their devices across different locations (such as home, work, coffee shops, or other locations), each location will have its own IP address. By tracking these patterns of movement between different IP addresses, companies can build detailed profiles of individual users' daily routines, movements, and behaviors, which may distinguish them from others who may be accessing the internet through the same IP address (such as other members of the same household).

18.    When combined with other information (such as browser type, device type, and user behavior) collected by cookies, trackers, and other technologies discussed herein, these IP address patterns allow companies to identify and track specific individuals with remarkable precision, even when multiple people share the

same IP address at a given location, and attach specific IP addresses to the comprehensive user profiles that they compile, thereby increasing their commercial value. For these reasons, Europe's General Data Protection Regulation ("GDPR") includes IP addresses as identifiers under its definition of "personal data."[3]

### III.    Cookies, Fingerprinting, and Identity Syncing/Resolution

19.    Cookies are small computer files that are automatically generated and stored on a user's browser cache (a form of temporary storage) when a user visits a website. They consist of unique strings of text that typically contain identifiers such as user IDs or session tokens rather than full personal details. These identifiers act as digital tags that link users to data stored on a website's or ad network's servers; data that may include email addresses, IP addresses, browsing history, device characteristics, and other information associated with the user. Cookies enable a website or a tracking tool installed on a website to recognize returning visitors and remember user preferences or actions. There are two types of cookies: first-party and third-party.

20.    First-party cookies are created and stored directly by the web server of a website that a user is visiting, primarily in order to improve website functionality

---

[3] GDPR Article 4 defines "Personal Data" as "any information relating to an identified or identifiable natural person . . . ." GEN. DATA PROT. REGUL., Ch. 1, Art. 4 (2018), *available at* https://gdpr-info.eu/art-4-gdpr/. IP addresses fall into the GDPR's category of "online identifiers for profiling and identification." GEN. DATA PROT. REGUL., Recital 30 (2018), *available at* https://gdpr-info.eu/recitals/no-30/.

and the user's experience. By contrast, third-party cookies are created and stored by someone other than the owner of the website, most commonly advertising networks, analytics providers, or data brokers, and are designed to facilitate the collection and aggregation of user data for marketing, tracking, and profiling purposes. Unlike first-party cookies, which only assist in gathering user data when users interact with the owner's website, third-party cookies can enable third parties such as advertising networks, analytics providers, and data brokers, to recognize a user's computers both when it visits the website in question and also when it visits other websites, and can thereby track users across multiple websites to provide a more comprehensive picture of users' behavior and monitor their online behavior. This is incredibly useful for advertisers because specific user data can enhance their success at targeted marketing. The Trackers discussed herein use third-party cookies, among other technologies, to track Website visitors.

21.    While the number of functions a cookie can perform is vast, it can only contain so much text, as it is restricted in size. To address this issue, most modern cookies now only contain a unique ID, while the associated data – such as inferred interests, demographics, or browsing history – is maintained on the third-party's servers. This structure enables companies to store, analyze, and enrich user data at scale while using the small cookie file solely as a reference key. In practice, the cookie's value lies not in the data it directly contains, but in the server-side profile

it links to.[4]

22.    Cookies pose significant privacy and data security risks, as they enable website owners to build up detailed user profiles that may include users' personal information such as their gender, religion or sexuality – information that can potentially be used to invade user privacy, spread misinformation, commit identity theft, blackmail individuals, or perpetrate fraud. Moreover, clearing cookies or switching browsers may not fully prevent tracking, as many advertising, tracking and data broker companies supplement cookies with device fingerprinting, probabilistic ID matching, or local storage mechanisms that achieve the same effect of persistent identification.

23.    Cookies are domain-specific, which means that cookies created by one third-party tracker cannot be read by another third-party tracker. However, most advertising platforms are able to overcome this limitation through "cookie syncing." This is a process by which two different advertising platforms "map" each other's unique IDs and subsequently share information they have both gathered about the same user, thereby allowing them to track users across various websites.  Without cookie syncing, the targeting capabilities of advertisers would be severely limited.[5]

---

[4] *What is Cookie Syncing and How Does It Work?*, AVENGA (May 2, 2025), https://www.avenga.com/magazine/cookie-syncing/ (last visited Dec. 29, 2025).

[5] *Id.*; *Cookie Syncing Explained*, AD TECH EXPLAINED (Sept. 30, 2019), https://www.adtechexplained.com/p/cookie-syncing-explained/ (last visited Dec. 17, 2025).

As discussed herein, the Adnxs Tracker and TripleLift Tracker engage in cookie syncing with various third-parties, including StackAdapt and Temu.

24.    In 2020, in an effort to enhance user privacy, Google announced that it would be phasing out, or "deprecating," third-party cookies in its web browser Chrome – used by nearly 3.5 billion individuals worldwide.[6] The initial deadline for the phasing out was 2022, which was postponed several times due to regulatory pressures until it was scrapped in 2024 and Google announced that it would instead be introducing a user "opt-in" feature. Google, however, decided to abandon this feature altogether in April 2025, leaving the future of third-party cookies secure and privacy concerns uncertain for now.[7] However, other web browsers continue to have various restrictions on third-party cookies, including Mozilla Firefox, Apple Safari, and Edge.[8]

---

[6] *Google Cookie Deprecation Reversal: What it Means for Marketers in 2025?*, COOKIEYES (Sept. 15, 2025), https://www.cookieyes.com/blog/google-cookie-deprecation/ (last visited Dec. 29, 2025); *Third-Party Cookies Going Away? Here's What's Actually Happening*, COOKIEYES (May 28, 2025), https://www.cookieyes.com/blog/third-party-cookies-going-away/ (last visited Dec. 29, 2025).

[7] *A New Path for Privacy Sandbox on the Web*, PRIVACY SANDBOX (July 22, 2024), https://privacysandbox.com/news/privacy-sandbox-update/ (last visited Dec. 29, 2025); *Next steps for Privacy Sandbox and tracking protections in Chrome*, PRIVACY SANDBOX (Apr. 22, 2025), https://privacysandbox.google.com/blog/privacy-sandbox-next-steps (last visited Dec. 29, 2025). "Privacy Sandbox" is an initiative led by Google to create standards for websites to access user information while protecting privacy.

[8] *What a World Beyond Third-Party Cookies Means for Digital Advertising*, EPSILON, https://www.epsilon.com/us/insights/third-party-cookies (last visited Dec. 29, 2025).

25.    The potential obsolescence of third-party cookies, on which advertisers have relied for years to track user behavior, serve highly targeted ads, and measure campaign performance, presents a number of serious challenges to advertisers.[9] Thus, while they continue to rely on third-party cookies (for the most part), digital advertising companies (including those discussed herein) have been working on coming up with alternative solutions and strategies to maintain effective tracking, ad targeting, and ad campaign measurement without third-party cookies.

26.    One alternative to third-party cookies is to utilize "first-party data" (sometimes referred to as "1P ID" or "1P data"). First-party data is "information businesses collect directly from their users through interactions on owned channels such as websites, mobile apps, and offline stores." First-party data "originates directly from user engagement,"[10] as opposed to "third-party data" (sometimes referred to as "3P ID" or "3P data"), which comes from external third parties. As discussed herein, Wunderkind uses first-party data.

27.    Another alternative solution is "device fingerprinting," which is "a tracking technique that identifies a device based on its unique configuration. A device fingerprint consists of a unique identifier created by collecting a device's hardware and software information, such as browser type, operating system, screen

---

[9] *Third-Party Cookies Going Away?, supra* note 6.

[10] *8 Best Third Party Cookie Alternatives in 2025*, COOKIEYES (May 28, 2025), https://www.cookieyes.com/blog/cookie-alternatives/ (last visited Dec. 17, 2025).

resolution, and installed fonts. Several of the technologies discussed herein, including Wunderkind, engage in device fingerprinting. Unlike cookies, which are stored client-side, device fingerprints are stored server-side, offering a persistent way to track users across sessions and platforms." Further, device fingerprints remain effective even when cookies are deleted and blocked.[11]

28.    Another alternative to third-party cookies is "identity ("ID") resolution/syncing," also referred to as "digital fingerprinting." ID syncing plays a crucial role in today's fragmented digital advertising ecosystem, where users frequently move between apps, browsers, and devices. It works by connecting and reconciling disparate customer data and identifiers from multiple sources – including first- and third-party sources – into a single unique user identifier. By synchronizing users' identifiers across platforms, advertisers can maintain continuity, ensuring users are consistently recognized and targeted across different digital contexts, thereby increasing the commercial value of their data for targeted advertising purposes. Further, when combined with the additional data obtained through tracking technologies and cookies, digital fingerprinting enables broad and detailed user profiling. If a user profile is sufficiently detailed, it can enable the identification of that user by using their personal information aggregated from multiple sources. Many of the technologies discussed below that are employed on the Arena Websites,

---

[11] *Id.*

including Wunderkind, engage in digital fingerprinting.

**IV.    The Digital Advertising Marketplace**

29.    At the heart of today's digital advertising marketplace – and this case – is "Real Time Bidding" ("RTB"). RTB "is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application." RTB "happens 178 trillion times every year across the U.S. and Europe."[12]

30.    The RTB process consists of a number of different platforms and systems within the digital advertising ecosystem, of which the main ones are: (i) publishers; (ii) supply side platforms ("SSPs"), (iii) demand side platforms ("DSPs"); (iv) advertising servers; (v) advertising exchanges; and (iv) data brokers.[13]

31.    "The publisher is the website that users visit" – in this case, the Arena Websites. "When a publisher decides to create a revenue stream through display advertising, they make ad space (ad slots) available on their website for potential content, known as inventory."[14]

---

[12]    Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/ (last visited Dec. 17, 2025).

[13]    *Id.*; *see also How Does Real-Time Bidding (RTB) Work?*, AVENGA (Aug. 29, 2025), https://www.avenga.com/magazine/real-time-bidding/ (last visited Dec. 29, 2025).

[14]    *How Does Real Time Bidding Work*, *supra* note 13.

32.     "SSPs primarily work with website or app publishers to help them participate in the RTB process." In other words, SSPs "help[ ] publishers monetize their websites and mobile apps by managing, selling and optimizing their available inventory (aka ad space)."[15]

33.     A DSP "is an advertising technology (AdTech) platform that allows advertisers working at brands and ad agencies to buy inventory (aka ad space) on an impression-by-impression[16] basis from publishers via supply-side platforms (SSPs) and ad exchanges."[17] "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[18] "DSPs enable media buyers (advertisers and agencies) to purchase  a range of inventory from many different publishers all from one user interface."[19] But DSPs are more than just middlemen; they also "[c]reate, run and manage a number of campaigns simultaneously across multiple SSPs and ad exchanges and control them from a

[15] *Id.*; *Top Supply-Side Platform (SSP) and Ad Exchange Companies*, AVENGA (Aug. 2, 2025), https://www.avenga.com/magazine/ssp-and-ad-exchange-companies/ (last visited Dec. 29, 2025).

[16] An "impression" is the number of times an advertisement is displayed on someone's screen. *See Impressions in Digital Marketing: What Are They and Why do They Matter?*, DASHTHIS, https://dashthis.com/blog/impressions-in-digital-marketing/ (last visited Dec. 17, 2025).

[17] *What Is a Demand-Side Platform (DSP) and How Does It Work?*, AVENGA (Apr. 23, 2025), https://www.avenga.com/magazine/demand-side-platform/ (last visited Dec. 29, 2025).

[18] *What is Real Time Bidding*, *supra* note 12.

[19] *What is a Demand-Side Platform, supra* note 177.

single, centralized user interface"; "[a]uto-optimize (via algorithms) the campaigns to increase ROIs [returns on investment]"; [u]se 3rd-party data from DMPs [Data Management Platforms][20] to improve targeting"; and [p]rovide real-time reporting via advanced analytics."[21]

34.    An advertising server is a technology platform used by publishers, advertisers, agencies, and networks to manage and run online advertising campaigns. Some ad servers have DSP and/or SSP features.[22]

35.    An advertising exchange "is a marketplace where buyers and sellers come together to trade digital media." The buyers (advertisers and agencies) use DSPs to bid on individual impressions, which are put up for sale by sellers (publishers) via SSPs.  This buying and selling process is handled through RTB.[23]

36.    "Nearly every time a person loads a page on a website or an app, an RTB auction takes place, largely unknown to the person. This auction broadcasts private information about the person to facilitate the bidding process to determine

---

[20] A Data Management Platform is a software system that collects, organizes, and analyzes customer data from various sources to create detailed audience profiles for targeted digital advertising and marketing. *See What is Data Management Platform (DMP)?*, ORACLE, https://www.oracle.com/cx/marketing/data-management-platform/what-is-dmp/ (last visited Dec. 17, 2025). Essentially, data brokers are the source of data, while DMPs are a tool to use that data.

[21] *What is a Demand-Side Platform, supra* note 1717.

[22] *What is an Ad Server and How Does it Work?*, AVENGA (July 2, 2025), https://www.avenga.com/magazine/what-is-an-ad-server/ (last visited Dec. 29, 2025).

[23] *Top Supply-Side Platform, supra* note 15.

which ad will be shown to the person." The RTB process takes place in real time, in a manner of approximately 100 milliseconds.[24]

37.    The way the RTB auction takes place is as follows:

After a user loads a website or app, an SSP will send user data to Advertising Exchanges in a process known as an "RTB bid request." The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user. The prospect of obtaining bidstream data drives many companies to participate in the auction process even if they have no intention of ever placing an advertisement. Moreover, after data is broadcast, there is no way to know how entities will handle the data.

This process is repeated every time a user accesses a website, a new page, or refreshes the page.[25]

38.    The more information DSPs are able to collect and compile about users, the more value the data has for targeted advertising purposes and the higher the bids will be. Much of this is facilitated through the installation of trackers on users'

---

[24] *Id.*; *What is a Demand-Side Platform, supra* note 17.

[25] *What is Real Time Bidding, supra* note 12.

browsers and the use of data brokers.

39.    Under California law, a "data broker" is "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship (subject to certain exceptions not applicable here). *See* CAL. CIV. CODE 1798.99.80(c). Any entity that qualifies as a "data broker" under California law must specifically register as such. *Id.* § 1798.99.82(a).

40.    Data brokers such as StackAdapt and Wunderkind, discussed below, collect users' data from multiple sources to sell it to DSPs and other online advertising companies.[26]

41.    Targeted advertising makes users "feel violated and unnerved by these practices."[27] In a survey conducted by a digital advertiser, 40% of respondents said targeted advertisements felt "unnerving" and 27% of respondents called such advertising "a violation."[28]

## V.    Defendant's Surreptitious Installation and Use of Third-Party Trackers

42.    Arena owns and operates the Arena Websites. Arena prides itself on

---

[26] *Data Broker*, CLEARCODE, https://clearcode.cc/glossary/data-broker/ (last visited Dec. 29, 2025).

[27] Megan Poinski, *Targeted Ads Are Getting Creepy , Consumers Say*, FORBES (Mar. 19, 2025) https://www.forbes.com/sites/cmo/2025/03/19/targeted-ads-are-getting-creepy-consumers-say/.

[28] *Id.*

providing its sponsorship partners with "Audience Targeting" through "[p]roprietary technology leveraging [its] fully addressable inventory to curate segments that connect advertisers to consumers in key moments."[29]

43.    When an individual visits any of the Arena Websites, whether on a computer or a mobile device, their browser sends an "HTTP request" or a "GET" request to Arena's servers (which includes the individual's IP address), and Arena responds with an "HTTP response" back to the browser with a set of instructions of how to load and display the Website content.

44.    The HTTP response also causes one or more third-party Trackers to be installed on the user's browser. The Trackers then cause the user's browser to send personally identifying information to third-party servers associated with the Trackers, including the user's IP address, device and browser information, and other personal information. The Trackers also store third-party cookies in the browser caches on the users' devices, enabling the third parties to recognize returning users and correlate their browsing activity across different internet sessions, websites, and devices.

45.    On the user's subsequent visit(s) to one of the Arena Websites, the Trackers locate the unique cookie identifier on the user's browser and cause the browser to again send the user's IP address, device information, and other personally

---

[29] THE ARENA GRP., https://thearenagroup.net/ (last visited Dec. 17, 2025).

identifying information, to the third-party. In the event that a user clears their cookies, the Tracker(s) will be wiped from their browser cache, and the next time he or she visits one of the Arena Websites, the process will begin all over again.

46.     The Trackers that Arena is installing on Websites' users' browsers analyze and store the data collected from Websites' users and, in many cases, combine it with other data they have obtained about users, to more accurately target advertising to them and to optimize the performance of marketing campaigns – with the ultimate goal of Arena earning additional revenue. Arena earns "revenue through sale of available ad space to the highest bidder," also known as "programmatic advertising."[30] Revenue from programmatic advertising is expected to account for roughly 70% of Arena's 2025 revenue.[31]

47.     Arena further profits from targeted advertising by partnering with affiliate brands (such as Amazon, Nike, and REI) who place targeted advertisements on Arena Websites. Arena earns a commission when users visit the Arena Websites and make a purchase through these targeted advertisements.[32]

48.     The personal information obtained and distributed by Defendant has

---

[30] The Arena Group Holdings, Inc., Form 8-K, at 10-11 (Sept. 11, 2025), *available at* https://investors.thearenagroup.net/financial-information/sec-filings) (Arena's revenue for 2024 was $125.9M with $55.7M profit).

[31] *Id.* at 10.

[32] *Id.* (The partnered advertising "drive[s] product sales earning a commission, generating high-margin, performance-based revenue").

significant economic value as consumers' personal information is viewed as a form of currency in the e-commerce industry. Consumers, like Plaintiffs and all Class Members, suffer economic injury as a result of Arena accessing and using their personal information and sharing their information with third parties.

49.    Plaintiffs and Class Members are also injured by losing their right to control their personal information and their ability to remain anonymous as they navigate the internet.

50.    Defendant knowingly embeds and executes the Trackers on the Arena Websites. By choosing to integrate these technologies, Defendant causes the browsers of Arena Websites' users to establish direct connections with those third parties' servers, thereby transmitting visitors' IP addresses, device identifiers, and communications content to the third parties. Defendant exercises control over which third-party trackers are installed on its Websites, and it profits from the data and advertising revenue generated by those Trackers. Accordingly, Defendant is directly responsible for the interception and disclosure of visitors' communications.

51.    Defendant does not request or obtain consent from users before installing the Trackers on their browsers.

52.    The Arena Websites instantaneously collect and send users' IP addresses and other personal information as soon as they enter the Websites. A user does not need to scroll through or interact with the Websites for Defendant to collect

their IP address or other personal information.

53.     Because the Trackers capture website visitors' "routing, addressing, or signaling information" (in the form of their IP addresses) without their consent or a court order, they constitute illegal "pen registers" under CIPA. CAL. PENAL CODE § 638.51.

## A. **The Adnxs Tracker**

54.     One of the third-party Trackers installed by Defendant on the Arena Websites is Adnxs.com (the "Adnxs Tracker"), which was developed by Xandr, Inc., a software company acquired by Microsoft in 2021. Microsoft owns and operates the Adnxs Tracker, which is part of a suite of tools provided by Microsoft to its customers as part of its Microsoft Advertising ecosystem (also called "Microsoft Invest").

55.     When an individual visits one of the Arena Websites, their browser sends an HTTP request to Arena's server (which includes the user's IP address), Arena's server sends an HTTP response with directions to install the Adnxs Tracker on the user's browser, and the Adnxs Tracker instructs the user's browser to automatically transmit the user's IP address and other personally-identifying information to Microsoft and stores cookies on the user's browser.

56.     "The Microsoft Advertising platform is a real-time bidding system and ad server." Microsoft Advertising (*i.e.*, the ADNXS Tracker) touts its "innovative

programmatic offerings," enabling advertisers and publishers to "[r]each the right audience across their digital life through rich ad experiences, consumer intelligence and within our expansive network, including exclusive partnerships." Microsoft Advertising provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[33] In other words, Microsoft facilitates the selling of Arena Websites' users to interested advertisers, who bid to show those users advertisements that are targeted to their identity and location.

57.    To do this, Microsoft utilizes data from its cookie store. After Microsoft receives advertising bids, it "overlay[s] segment data from [its] server-side cookie store. Data is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [Microsoft] also contact[s] third-party data providers and overlay[s] any available data."[34]

58.    Some of the cookies installed by the Adnxs Tracker on individuals' browsers when they visit one of the Arena Websites are the "uuid2," "uids," "anj," "usersync," and "icu" cookies (collectively, the "Adnxs Cookies").

59.    The uuid2 cookie, which persists for 90 days, is used to engage in

---

[33]    *About Microsoft Invest*, MICROSOFT (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 29, 2025); *Discover What's Possible*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en#ad-technology (last visited Dec. 17, 2025).

[34] *About Microsoft Invest*, *supra* note 33.

targeted advertising and measure the performance of those advertisements.[35] The uids cookie aids in communicating to real-time advertising bidders the user's browser and device information and persists for 120 days.[36] The anj cookie and the usersync cookie communicate the user's cookie ID to third-party advertising partners and persists for 90 days.[37] The icu cookie, which persists for 90 days, aids targeted advertising efforts by monitoring how many times an ad has been shown, how recently it was shown, and how many total ads the user has been shown.[38]

60.    The persistent nature of the Adnxs Cookies allows Microsoft to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique cookies. While a user's IP address may change between Website visits (for instance, when accessing the Arena Websites from different locations), the identifiers associated with the cookies remain constant for 90-120 days, unless a user manually "clears" their cookies (upon which the Adnxs Tracker will automatically generate new, unique cookies).

61.    Through these mechanisms, the Adnxs Tracker engages in a process of

---

[35] *uuid2*, COOKIE.IS, https://www.cookie.is/uuid2 (last visited Dec. 17, 2025).

[36] *uids* COOKIELIBRARY, https://cookielibrary.org/cookie_consent/uids-2/ (last visited Dec. 23, 2025).

[37] *anj* COOKIELIBRARY, https://cookielibrary.org/cookie_consent/anj/ (last visited Dec. 23, 2025); *usersync* COOKIELIBRARY, https://cookielibrary.org/cookie_consent/usersync/ (last visited Dec. 23, 2025).

[38] *icu* COOKIELIBRARY, https://cookielibrary.org/cookie_consent/icu/ (last visited Dec. 23, 2025).

"fingerprinting" each user who browses the Arena Websites. When a user visits one of the Arena Websites, their browser transmits their IP address, cookie information, and other data to Microsoft's servers, which allows Microsoft to correlate multiple IP addresses and browsing events with a single user profile over time, creating a comprehensive record of the user's geographic locations and Website activities across all their devices, including the various IP addresses and locations from which the Arena Websites were accessed.

62.    By permitting the Adnxs Tracker to operate on the Arena Websites and to transmit users' IP addresses and other connection data to Microsoft, Defendant enables Microsoft Advertising to deliver sponsored or personalized advertising based on users' geographic location and browsing activity. These advertisements appear within or alongside Arena Website content and generate revenue for Defendant when users view or interact with them.

63.    Microsoft also shares user data with third parties. Xandr's website contains a list of dozens of "third party partners which may receive Platform Data and other information . . . as a result of their partnership with Xandr or due to the partnerships with Xandr customers using Xandr's technology" one of which is BounceX (Wunderkind), discussed below.[39] Microsoft integrates with the Bounce

---

[39] *Third Party Providers*, XANDR (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/policies-regulations/third-party-providers (last visited Dec. 23, 2025).

Exchange Tracker on the Arena Websites to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users. In other words, when users visit one of the Arena Websites, Microsoft collects users' IP addresses through its Adnxs Tracker to provide to advertisers interested in showing an advertisement to Defendant's Website users, enriching that information by integrating with the Bounce Exchange Tracker, and ultimately enabling Defendant to monetize the Arena Websites and maximize revenue by collecting and disclosing user information.

64.    The following are screenshots demonstrating the operation of the Adnxs Tracker on a user's browser visiting The Street Website, the Parade Website, and the Athlon Website. In the below example of the information exchanged while a user browses The Street Website (see bottom box in left-hand column), the user's browser and device information appear in the middle box in the left-hand column and the user's IP address appears in the box in the middle column. This information is transmitted to a domain associated with Adnxs, ib.adnxs.com, through the Adnxs Tracker (see box at top left), which Defendant installed on the user's browser, along with the uuid2 cookie, as reflected in the box on the far right.

65.    In the below example of the information exchanged while a user browses the Parade Website (see bottom box in left-hand column), the user's browser and device information appear in the middle box in the left-hand column and the user's IP address appears in the box in the middle column. This information is transmitted to a domain associated with Adnxs, ib.adnxs.com, through the Adnxs Tracker, which Defendant installed on the user's browser along with the Adnxs Cookies, as reflected in the box at the top left and the box in the right-hand column.



66.    In the below example of the information exchanged while a user browses the Athlon Website (see bottom box in left-hand column), the user's browser and device information appear in the middle box in the left-hand column and the user's IP address appears in the box in the middle column. This information is transmitted to a domain associated with Adnxs, ib.adnxs.com, through the Adnxs Tracker which Defendant installed on the user's browser along with the Adnxs Cookies, as reflected in the box at the top left and in the box on the far right.



## B. **The Casale Media Tracker**

67.     Another third-party Tracker installed by Defendant on the Parade Website and the Athlon Website is the Casale Media Tracker, developed by Index Exchange, Inc. ("Index Exchange"), formerly known as Casale Media.

68.     Arena is one of the Publishers with whom the Index Exchange partners. When a user visits the Parade Website or the Athlon Website, their browser sends an HTTP request to Arena's server (which includes the user's IP address), and Arena's server sends an HTTP response with directions to install the Casale Media Tracker on the user's browser, and the Casale Media Tracker instructs the user's

browser to automatically transmit the user's IP address to the Index Exchange and stores unique identifier cookies on the user's browser.

69.    The Index Exchange "hosts digital auctions that help [its] clients buy and sell online ads," such as those found on websites.[40]  The Index Exchange "act[s] as an intermediary between buyers and sellers" – in other words, it "connects Ad Partners with Publishers [*e.g.*, Arena][41] to deliver relevant digital ads to [consumers]."[42] The Casale Media Tracker is a tool used within Index Exchange's advertising ecosystem that collects user data to refine advertisement targeting, thereby improving advertisement effectiveness. In other words, by storing and analyzing information collected from website visitors, the Casale Media Tracker enables the Index Exchange's customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits.

70.    Some of the cookies installed by the Casale Media Tracker on individuals' browsers when they visit the Parade Website or the Athlon Website are the "CMID," "CMPS," and "CMPRO" cookies (collectively, the "Casale Cookies").

---

[40] *Exchange Platform Privacy Policy*, INDEX EXCHANGE (Jan. 2, 2025) https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/#section-2 (last visited Dec. 23, 2025).

[41] As explained in the privacy policy, "Publishers own or operate the Digital Properties that [users] may use or visit." *Id.*

[42] *Id.*

71.    The CMID cookie, which persists for one year, is a "[u]nique identifier that websites and servers associate with [users'] web browser at Index Exchange and across sites and servers."[43] In other words, "[w]ith our cookie stored in your web browser, we are able to recognize your browser across different sites."[44] The CMPS cookie collects data for targeted advertising purposes, such as the user's number of visits to the website, average time spent on the website, and the pages viewed, and persists for one day.[45] The CMPRO cookie tracks what advertisements the user has been shown across multiple websites to provide more targeted advertisements and limit the number of times the user has seen a particular advertisement, and persists for one day.[46]

72.    Some of the personal data the Casale Media Tracker processes when users visit the Parade Website or the Athlon Website include (i) "digital identifiers," such as cookie ids, device advertising IDs, and "third-party IDs"; (ii) "browser and device information," such as the type and version of a user's browser, browser settings, user agent, IP address, and device type; (iii) "location information," such

---

[43] *Exchange Platform Cookie Notice*, INDEX EXCHANGE, (Jan. 2, 2025) https://www.indexexchange.com/privacy/index-exchange-platform-cookie-notice/ (last visited Dec. 23, 2025).

[44] *Id.*

[45] *CMPS*, COOKIELIBRARY, https://cookielibrary.org/cookie_consent/cmps/ (last visited Dec. 23, 2025).

[46] *CMPRO*, COOKIELIBRARY, https://cookielibrary.org/cookie_consent/cmpro/ (last visited Dec. 23, 2025).

as city, country, zip code, and longitude or latitude; and (iv) "other data" provided by Publishers to improve advertising, such as a users' interests or demographic information.[47]

73.    The persistent nature of the CMID Cookie allow the Casale Media Tracker to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique Casale Cookies. While a user's IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the CMID cookie remains constant for one year unless a user manually "clears" their cookies (upon which the Index Exchange will automatically generate a new, unique CMID cookie).[48]

74.    The following are screenshots demonstrating the operation of the Casale Media Tracker on an Arena Website visitor's browser – specifically, Defendant's sharing of the user's IP and additional device information with the Index Exchange and placement of the Casale Cookies on the user's browser. In the image below, the user's IP address (see second box in left-hand column) and the user's precise latitude and longitude (see box in middle column) are being shared with Casale Media (see box at top left), while the user is browsing the Parade

---

[47] *Exchange Platform Privacy Policy*, *supra* note 40.

[48] *Exchange Platform Cookie Notice*, *supra* note 43.

Website (see bottom box in left-hand column). The Casale Cookies are attached to the user's browser, as illustrated in the box on the far right:



75.　　In the image below, the user's IP address (see box in middle column) and device and browser information (see middle box in left-hand column) is shared with Casale Media (see box at top left), while the user is browsing the Athlon Website (see bottom box in left-hand column). The Casale Cookies are attached to the user's browser, as illustrated in the box on the far right.

## C. **The PubMatic Tracker**

76.    PubMatic, which is headquartered in California and is a California registered data broker,[49] is an SSP that develops and implements online advertising software and strategies for the digital publishing and advertising industry. PubMatic is "one of the world's leading scaled digital advertising platforms," that "exist[s] to

---

[49] *See Data Broker Registration for PubMatic, Inc.*, CAL. ATT'Y GEN., https://www.oag.ca.gov/data-broker/registration/186702 (last visited Dec. 29, 2025).

enable content creators to run a more profitable advertising business." It "offer[s] more transparent advertising solutions to publishers, media buyers and data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[50] To accomplish these goals, PubMatic uses cookies and a variety of other tracking tools to receive, store, and analyze information collected from visitors to its partners' websites – including the Arena Websites.

77.    As PubMatic explains:

> We partner with website publishers to deliver advertising that we believe may interest you based on your activity on our publishers' websites and other websites over time.  We set and access cookies on your computer or other device to perform this service and may also use web logs, pixel tags, or web beacons. These cookies and other technologies are used to deliver advertisements that are more relevant to you and your interests.  They are also used to limit the number of times you see an advertisement as well as to help measure the effectiveness of the advertising campaign.[51]

78.    PubMatic assigns Online Identifiers to users' browsers "to enable our Ad Services to determine within a reasonable level of confidence that a browser or device is the same with which our Ad Services have previously interacted." The reason for doing this, as PubMatic explains, is that "[i]f we (or our Media Buyers)

---

[50]    *The Supply Chain of the Future. Built for You.*, PUBMATIC, https://pubmatic.com/about-us/ (last visited Dec. 29, 2025).

[51]    *Platform Cookie & Other Similar Technologies Policy*, PUBMATIC (Nov. 2024), https://pubmatic.com/legal/platform-cookie-policy/ (last visited Dec. 29, 2025).

can identify a browser or device, it increases the value of that advertisement....”[52]

79.    The user information collected by PubMatic and associated with the Online Identifiers described above includes: (1) unique cookie IDs; (2) “unique online IDs (“UUIDs”) created by identity providers and used by [its] Clients”; (3) “Browser and Device Information,” such as IP address, device type and model, operating system and web browser type, (4) “Behavioral Information,” such as how the user interacts with Defendant’s website and session start/stop time, (5) “Ad Interaction,” such as the type of ad, whether the user interacted with the ad, and whether the user purchased or installed the product or service advertised, and (6) “Geolocation Information,” derived from the location of a user’s device via its IP address.

80.    In addition, PubMatic may also “combine, merge and/or augment this user information with other information received from its clients,” including demographic information (such as age and gender) or interest data, content viewed, and “[p]recise geolocation data.” This helps PubMatic to further “customize and more effectively tailor the ads we display to End Users and to optimize the display of ads.”[53]

---

[52] *Advertiser Platform Privacy Policy*, PUBMATIC (Nov. 21, 2024), https://pubmatic.com/legal/privacy-policy/#userinfowecollect (last visited Dec. 29, 2025).

[53] *Id.*

81.    Some of the cookies set on Website visitors' browsers by PubMatic are the "KADUSERCOOKIE" and the "KRTBCOOKIE" (collectively, the "PubMatic Cookies"). The KADUSERCOOKIE is used "to uniquely identify each browser or device from which an individual user visits [PubMatic's] partners' websites."[54] The KRTBCOOKIE, which persists for 29 days, is used to identify "the user's device during return visits across websites that use the same ad network. The ID is used to allow targeted ads."[55]

82.    PubMatic also provides identity resolution through its "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace," which allows PubMatic to "drive monetization in cookie-restricted environments with specialized technology."[56]

83.    PubMatic recently announced that it has integrated the artificial intelligence technology of NVIDIA across its global infrastructure, which will "deliver[ ] AI processing up to five times faster than traditional systems, helping publishers recover ad spend lost to latency and timeouts, while unlocking AI-driven

---

[54] *PubMatic Platform Cookie Policy*, supra *note* 52.

[55]                        *KRTBCOOKIE* ,                        COOKIELIBRARY, https://cookielibrary.org/cookie_consent/krtbcookie_/ (last visited Dec. 29, 2025).

[56]    *Identity Hub*, PUBMATIC, https://pubmatic.com/products/identity-hub/ (last visited Dec. 29, 2025).

optimization strategies."[57]

84.    The following are screenshots demonstrating the operation of the PubMatic Tracker on a user's browser visiting the Arena Websites – specifically, Defendant's sharing of the user's IP address and additional information about their device with PubMatic and placement of the PubMatic Cookies on the user's browser. In the below example of a user interacting with The Street Website (see bottom box in left-hand column), the user's device information (see middle box in left-hand column) and IP address (see box in middle column) are being collected and shared with PubMatic via the PubMatic Cookies (see box in right-hand column).



[57] PubMatic press release, "PubMatic Delivers 5x Faster, Smarter Advertising Decisions With NVIDIA," BUSINESS WIRE (Oct. 8, 2025), *available at* https://investors.pubmatic.com/news-releases/news-release-details/pubmatic-delivers-5x-faster-smarter-advertising-decisions-nvidia.

85.    In the below example of a user interacting with the Parade Website (see bottom box in left-hand column), the user's device information (see middle box in left-hand column) and IP address (see box in middle column) are being collected and shared with PubMatic via the PubMatic Cookies (see box in right-hand column).



86.    In the below example of a user interacting with the Athlon Website (see bottom box in left-hand column), the user's device information (see middle box in left-hand column) and IP address (see box in middle column) are being collected and shared with PubMatic via the PubMatic Cookies (see box in right-hand column).



## D. **The TripleLift Tracker**

87.     Another third-party tracker installed by Defendant on The Street Website and Parade Website visitors' browsers is the TripleLift Tracker. TripleLift is a software-as-a-service company that "provides a suite of technology products that facilitate digital advertising."[58]

88.     When a user visits The Street Website or the Parade Website, their browser sends an HTTP request to Arena's server (which includes the user's IP address), and Arena's server sends an HTTP response with directions to install the TripleLift Tracker on the user's browser, and the TripleLift Tracker instructs the

---

[58] *TripleLift Advertising Technology Platform Cookie Notice*, TRIPLELIFT (Apr. 17, 2024), https://triplelift.com/advertising-technology-platform-cookie-notice/ (last visited Dec. 29, 2025).

user's browser to automatically transmit the user's IP address to TripleLift and stores unique identifier cookies on the user's browser.

89.    TripleLift boasts that it is "redefining digital advertising by delivering innovative, high-quality ad experiences that create real connections."[59] "By combining cutting-edge creative technology, actionable data, advanced targeting, and premium inventory, [TripleLift] empowers publishers and brands to discover new opportunities, achieve measurable outcomes, and engage audiences seamlessly across every platform."[60] In other words, by storing and analyzing information collected from website visitors, the TripleLift Tracker enables its customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits. One way that TripleLift accomplishes these goals is by using cookies.[61]

90.    One of the cookies placed by TripleLift on The Street Website and Parade Website users' browsers is the "TLUID" cookie.  This cookie is "used to identify web browsers across sites and over time for ad serving purposes."[62] The TLUID cookie, along with its unique identifier, remains in a user's browser for 90

---

[59] *Creative That Performs*, TRIPLELIFT, https://triplelift.com/about/ (last visited Dec. 29, 2025).

[60] *Id.*

[61] *TripleLift Cookie Notice*, *supra* note 58.

[62] *Id.*

days unless a user manually "clears" their cookies (upon which TripleLift will automatically generate a new, unique TLUID cookie).[63] The persistent nature of the TLUID cookie allows TripleLift to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique TLUID cookie.

91.    Another cookie utilized by TripleLift is the "sync" cookie, which enables TripleLift to conduct "user syncing" by aligning unique user identifiers across its system and partner platforms. This allows TripleLift to sync and exchange identifiers with third-party advertisers and tracks which companies have recently been synced with this user to avoid repetitive advertising.[64] Like the TLUID cookie, the sync cookie has a 90-day persistent lifespan.[65]

92.    TripleLift shares website visitors' information with third parties through its user sync technology. Such third parties include Temu, a China-based online marketplace for low-cost goods, and StackAdapt, a programmatic advertising platform that enables advertisers and agencies to buy, manage, and track digital

---

[63] *Id.*

[64]    *sync*, COOKIELIBRARY, https://cookielibrary.org/cookie_consent/sync/ (last visited Dec. 29, 2025).

[65] *Id.*

media campaigns.[66]

93.    The following are screenshots demonstrating operation of the TripleLift Tracker on an Arena Websites' visitor's browser – specifically, Defendant's sharing of the user's IP address and additional device information with TripleLift and placement of the TLUID cookie on the user's browser, as well as TripleLift's sharing of that information through user sync with StackAdapt. In the below example of a user session on The Street Website (see bottom box in left-hand column), the TLUID cookie is present (see box in right-hand column) and sharing information about the user's device with StackAdapt through its user sync process (see box in middle column).



[66]    *The Leading Technology That Connects*, STACKADAPT, https://www.stackadapt.com/ (last visited Dec. 29, 2025).

38.    The below image shows the user's information being shared with StackAdapt, as reflected in the box at the top left of the image, by TripleLift (see bottom box in left-hand column). The user's IP address (see box in middle column) and browser and device information (see middle box in left-hand column) are being collected and shared through StackAdapt's cookies (see the box in the right-hand column).



39.    In the below example of a user session on the Parade Website (see bottom box in left-hand column), the TLUID cookie and the sync cookie are present (see box on the far right) and sharing information about the user's device with Temu through its user sync process (see box in middle column).



40.    The below image shows the user's information being shared with Temu, as reflected in the box at the top of the image, by TripleLift (see bottom box in left-hand column). The user's IP address (see box in right-hand column) and browser and device information (see middle box in left-hand column) are being collected and shared with Temu.



### E. The Bounce Exchange Tracker

38.     Another third-party tracker installed by Defendant on Parade Website and Athlon Website visitors' browsers is the Bounce Exchange Tracker, which is developed, owned, and operated by Wunderkind.

39.     When a user visits the Parade Website or the Athlon Website, their browser sends an HTTP request to Arena's server (which includes the user's IP address), and Arena's server sends an HTTP response with directions to install the Bounce Exchange Tracker on the user's browser, and the Bounce Exchange Tracker instructs the user's browser to automatically transmit the user's IP address and other personally identifying information to Wunderkind.

40.    Wunderkind, a DSP and registered data broker in the State of California,[67] is a behavioral automation software and analytics company that helps its clients "drive higher engagement from their website visitors" through its advertising platforms.[68] According to Wunderkind, its "custom [ad] placements are designed to fit both [its] advertiser and publishing partners' needs." "A WunderKIND Ad experience drives results."[69]

41.    The way this works is through the collection by Wunderkind of Website users' personal information – including, but not limited to "[b]rowsing history, search history, [and] information on a consumer's interaction with a website, application, or advertisement." Wunderkind "may transfer data collected through … [its] marketing activities to entities such as "(i) website analytics vendors, who collect cookie and website engagement information to help understand website performance, (ii) advertising vendors, who collect cookie and website engagement information to target relevant advertising, and (iii) email marketing and lead database vendors, who collect email address and other personal information to

---

[67] *See Data Broker Registration for Wunderkind Corp.*, CAL DEP'T JUST., https://www.oag.ca.gov/data-broker/registration/191359 (last visited Dec. 29, 2025).

[68] *Wunderkind Corporation: Privacy Policy*, WUNDERKIND (Sept. 26, 2025), https://www.wunderkind.co/privacy/ (last visited Dec. 29, 2025).

[69] *Stop Annoying Your Audience with Intrusive Ads*, WUNDERKIND, https://www.wunderkind.co/how-it-works/advertising-solutions-for-advertisers-and-publishers/ (last visited Dec. 29, 2025).

improve email marketing efforts."[70]

42.    Wunderkind is also an "AI decisioning platform that helps brands drive more revenue by increasing reach through identity," through its "proprietary identity graph [that] resolves anonymous traffic into known users . . . ." Indeed, Wunderkind claims that its "Identity Network recognizes over 9 billion consumer devices and 1 billion consumer profiles and stores them in [its] Identity Graph."[71] Wunderkind is able to do this by matching the information it already has about users with the information it is collecting via the Bounce Exchange Tracker.

43.    Because, as discussed earlier, third-party cookies are on the decline, Wunderkind has created alternative methods to track and identify users across browsers and devices, including using "first-party insights such as purchase history, website activity, and other behavioral data, to give retailers and other brands an alternative to tracking cookies."[72]

44.    Wunderkind recently partnered with Meta Ads Manager to bolster its first-party cookie tracking capabilities, noting on its website that Meta's "pixel sits

---

[70] *Wunderkind Privacy Policy*, *supra* note 68.

[71] *How Wunderkind Converts Identity Into Revenue*, WUNDERKIND, https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/ (last visited Dec. 29, 2025).

[72] *Wunderkind Unveils Identity Solution Enhancements to Amplify Customer Revenue and Experiences,* WUNDERKIND (Sept. 25, 2024), https://www.wunderkind.co/blog/article/wunderkind-unveils-identity-solution-enhancements-to-amplify-customer-revenue-and-experiences/ (last visited Dec. 29, 2025).

on millions of websites, quietly collecting first-party behavioral data that fuels retargeting, lookalike creation, and optimization across Facebook, Instagram, and beyond." Meta Ads Manager provides the browsing behavior data and Wunderkind provides the user identification data by "recogniz[ing] who that shopper is, whether they've opened an email, clicked a text, or are in a triggered abandonment flow." This partnership allows third parties to curate audience groups with greater precision, identify users, and retarget "warm prospects – like those who opened a message or browsed a product category."[73]

45.    The information collected by the Bounce Exchange Tracker from Arena Websites' visitors includes "IP address, browser type, operating system, Internet Service Provider, referrer address, the time/date an ad is served and the site or mobile app that the ad is served in addition to other log file information," which is "used to offer products and Services designed to help [its] Clients better understand how their websites are being utilized, draw insights on how to better engage Users on their sites, to deliver more relevant advertising messages based upon the User visits to their sites, and to provide Clients with ad delivery reports."[74]

46.    In addition, "[a]s with most web technologies, Wunderkind may

---

[73] Molly Shuttlesworth, *Wunderkind Audiences for Meta: Precision Targeting, Elevated*, WUNDERKIND (Oct. 28, 2025), *available at* https://www.wunderkind.co/blog/article/audiences-for-meta/.

[74] *Wunderkind Privacy Policy*, *supra* note 68.

leverage cookies to track user history across pages and sessions. Cookies allow [Wunderkind] to maintain information about end-users, improve the user shopping experience, and make intelligent segmentation decisions when serving onsite, triggered email, and text campaigns."[75]

47.    In other words, Wunderkind stores and analyzes information collected from Arena Websites' visitors and compiles comprehensive user profiles by tracking these visitors across the internet, and provides that valuable information to its customers, such as Defendant, enabling them to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits.

48.    One of the cookies installed by the Bounce Exchange Tracker on the Parade Website and the Athlon Website users' browsers is bounceClientVisitXXXXc (the "Bounce Cookie"), which is designed to collect and retain "user browsing activity and may be used to understand about [user] demographics, such as age and gender."[76]

49.    Defendant has installed the Bounce Exchange Tracker on the Arena

---

[75] *Wunderkind Cookies and Consent Management Platforms*, WUNDERKIND SUPPORT,    https://support.wunderkind.co/hc/en-us/articles/25775724847771-Wunderkind-Cookies-and-Consent-Management-Platforms (last visited Dec. 29, 2025); *see also Wunderkind Privacy Policy*, *supra* note 68.

[76]    *bounceClientVisit*,    COOKIE    LIBRARY, https://cookielibrary.org/cookie_consent/bounceclientvisit/ (last visited Dec. 29, 2025).

Websites to monetize user data by participating in Wunderkind's behavioral marketing and identity-resolution platform. By allowing Wunderkind's tracking code to collect Websites' users' IP addresses, location, device characteristics, and browsing activity, Defendant enables Wunderkind to recognize returning visitors, enrich user profiles, and deliver personalized advertising and marketing messages. These marketing integrations increase Defendant's advertising and conversion revenues by allowing them to re-target visitors across sessions, browsers, and devices. By embedding Wunderkind's tracking technology on the Arena Websites, Defendant benefits financially from the use of visitors' personal data for profiling and marketing purposes, while disclosing that data to third parties without adequate notice or consent. Through this unauthorized data sharing, Defendant has prioritized their commercial interests over users' privacy rights.

50.    The following are screenshots demonstrating operation of the Bounce Exchange Tracker on an Arena Website visitor's browser – specifically, Defendant's sharing of the user's IP address, location, and additional device information with Wunderkind and placement of the Bounce Cookie on the user's browser. In the below image, the user's browser and device information (see middle box in left-hand column), IP address (see top box in right-hand column), and geolocation, including city, state, zip code, and precise latitude and longitude (see bottom box in right-hand column) are being collected and shared by the Bounce Exchange Tracker (see box

at top-left), while browsing the Parade Website (see bottom box in left-hand column).



51.    In the below image, the user's browser and device information (see middle box in left-hand column), IP address (see first box in right-hand column), and precise latitude and longitude (see two lower boxes in right-hand column) are being collected and shared by the Bounce Exchange Tracker (see box at top left),

while browsing the Athlon Website (see bottom box in left-hand column).



### F. 33Across Tracker

52.    Another third-party tracker installed by Defendant on The Street Website and Parade Website visitors' browsers is the 33Across Tracker. This Tracker is developed, owned, and operated by 33Across, Inc. ("33Across"), which specializes in targeted advertising through "cross-device bidding technology" services it provides to third parties.[77]

53.    33Across gathers user data, such as IP addresses and cookies, to inform

---

[77] *About Us*, 33ACROSS, https://www.33across.com/about-us (last visited Dec. 29, 2025).

its programmatic advertising and audience targeting. It does so through the use of the 33Across cookie, "33x_ps."

54.    The 33x_ps cookie is used for "targeted and behavioural advertising services," and persists on users' browsers for one year.[78]

55.    The 33Across Tracker activates when a user visits a website that has integrated 33Across's technology, and collects information related to the user's online activity. Such information includes the user's IP address, device, and browser information. The 33Across Tracker serves as a unique identifier that is stored in a user's browser while it collects data such as the user's browsing behavior, interaction history, and device information. The 33Across Tracker enhances targeted advertisement, measures ad-campaign performance, and allows tracking between websites and browsers.

56.    The screenshots below illustrate how the 33Across Tracker captures information from a user's browsing session on The Street Website and the Parade Website. The following image depicts a user's browsing session on The Street Website (see bottom box in left-hand column). The user's IP address (see box in middle column) and device and browser information (see middle box in left-hand column) are being shared with 33Across (see box at top left), through the use of the

---

[78] *33x_ps*, COOKIELIBRARY.ORG, https://cookielibrary.org/cookie_consent/33x_ps/ (last visited Dec. 29, 2025).

33Across Tracker and placement of the 33x_ps cookie on the user's browser (see box in right-hand column ).



57.     The following image depicts a user's browsing session on the Parade Website (see bottom box in left-hand column). The user's IP address (see box in middle column) and device and browser information (see middle box in left-hand column) are being shared with 33Across (see box at top left), through the use of the 33Across Tracker and placement of the 33x_ps cookie on the user's browser (see box in right-hand column).

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15

## Plaintiffs' Experiences

16

### Plaintiff Kendall McKenzie

17

18     58.     Plaintiff Kendall McKenzie has visited the Parade Website numerous

19  times, including on or about October 29, 2025. When Ms. McKenzie visited the

20  Parade Website, she was in the State of California.

21

22     59.     On information and belief, during Ms. McKenzie's visits to the Parade

23  Website, Defendant caused one or more of the Trackers to be installed on her

24  browser, and Defendant used the Trackers to collect Ms. McKenzie's personal

25  information, including her IP address, and to track her location through the use of

26
27
28

cookies.

60.    Defendant used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Ms. McKenzie's location, and ultimately boost its and its advertisers' revenue. Defendant also shared the information collected by the Trackers with various third parties, including data brokers.

61.    When Ms. McKenzie visited the Parade Website, she was unaware of Defendant's tracking practices.

62.    Ms. McKenzie did not provide consent prior to the installation of the Trackers on her browser.

63.    Defendant did not obtain a court order before installing or using the Trackers on Ms. McKenzie's browser.

Plaintiff Yi-Chieh Cheng

64.    Plaintiff Yi-Chieh Cheng has visited The Street Website numerous times on his computer to read news articles, including on or about September 1, 2025. When Mr. Cheng visited The Street Website, he was in the State of California.

65.    On information and belief, during Mr. Cheng's visits to The Street Website, Defendant caused one or more of the Trackers to be installed on his browser, and Defendant used the Trackers to collect Mr. Cheng's personal information, including his IP address, and to track his location through the use of

cookies.

66.    Defendant used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Mr. Cheng's location, and ultimately boost its and its advertisers' revenue. Defendant also shared the information collected by the Trackers with various third parties, including data brokers.

67.    When Mr. Cheng visited The Street Website, he was unaware of Defendant's tracking practices.

68.    Mr. Cheng did not provide consent prior to the installation of the Trackers on his browser.

69.    Defendant did not obtain a court order before installing or using the Trackers on Mr. Cheng's browser.

## CLASS ACTION ALLEGATIONS

70.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

71.    Plaintiffs propose the following Class, consisting of and defined as follows:

All California residents who accessed www.TheStreet.com, www.parade.com, or www.athlonsports.com and had their IP addresses and

other personal information collected by one or more third-party trackers, including but not limited to the Adnxs Tracker, the Casale Media Tracker, the PubMatic Tracker, the TripleLift Tracker, the Bounce Exchange Tracker, and/or the 33Across Tracker, during the relevant time period.

72.    Excluded from the Class are Defendant, its subsidiaries, parents, successors, predecessors, assigns, agents, affiliates, and any entity or division in which Defendant has a controlling interest; current or former employees, officers and directors of Defendant; and the Judge to whom this case is assigned and the Judge's staff. Plaintiffs reserve the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability.

73.    **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the entire Class is currently unknown to Plaintiffs at this time; however, given that, on information and belief, Defendant has millions of visitors to its Websites, it is reasonable to presume that the number of Class members is in the thousands. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

74.    **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

A.  Whether the Trackers are pen registers as defined by law;

B.  Whether Defendant had consent from Plaintiffs and Class members to collect their IP addresses, browser or device data, or other personal

information; and

C. Whether Defendant sought or obtained a court order to utilize the Trackers on its Websites.

75.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class Members, visited at least one of the Arena Websites and had their IP addresses and other personal information collected by the Trackers.

76.    **Adequacy**: Each Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom they are similarly situated, as demonstrated herein. Plaintiffs' attorneys, the proposed class counsel, are experienced in handling consumer and other class actions.

77.    **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of the Class. The elements of the legal claims brought by Plaintiffs and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

78.    **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because class-wide damages are essential to induce Defendant to comply with California law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT
### CAL. PENAL CODE § 638.51

79.     Plaintiffs repeat, re-allege, and incorporate by reference, the preceding paragraphs above as if fully set forth herein.

80.     California Penal Code Section 638.51 prohibits any person from using a "pen register" without a court order or consent.

81.     The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." CAL. PENAL CODE § 638.50(b).

82.     The Trackers are "pen registers" because they are devices or processes that captured "the routing, addressing, or signaling information" – the IP addresses – from the electronic communications transmitted by Plaintiffs' computers and/or mobile devices. CAL. PENAL CODE § 638.51(a).

83.     Defendant installed the Trackers on Plaintiffs' browsers and used the

Trackers to collect Plaintiffs' IP addresses and other personal information and to track Plaintiffs.

84.    IP addresses constitute routing and addressing information and do not reveal the contents of the communications between users and the Arena Websites.

85.    Plaintiffs did not provide their consent prior to Defendant's installation or use of the Trackers on their browsers.

86.    Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' IP addresses and other personal information.

87.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. Award statutory damages to Plaintiffs;

D. Award compensatory damages to Plaintiffs;

E. Award reasonable attorneys' fees and costs to Plaintiffs;

F. Award pre-judgment and post-judgment interest on such monetary relief; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: January 5, 2026          **KAHN SWICK & FOTI, LLC**

By: */s/ Kim E. Miller*
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*